# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## ST. JOSEPH DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

ALL USDT
associated with the cryptocurrency
address ending in -EJnsy; and

ALL USDT
associated with the cryptocurrency
address ending in - MTqdk;

      Defendants.

Civil No.    5:26-cv-6128

## **COMPLAINT FOR FORFEITURE IN REM**

Plaintiff, United States of America, by its attorneys, R. Matthew Price, United States Attorney for the Western District of Missouri, and John Constance, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## **NATURE OF THE ACTION**

1. This is an action to forfeit property to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C) based on violations of 18 U.S.C. §§ 1956(h) and 1343, seeking civil forfeiture of the following USDT (Tether)[1]:

---

[1] USDT is a stablecoin. Each USDT token is worth approximately $1.00 USD and claimed to be backed by $1.00 USD in physical reserves. Payments or transfers of value made with USDT are recorded in the blockchain network.

1

- Approximately 69,306.396675 USDT associated with the cryptocurrency address ending in -EJnsy ("**Target Address 1**")

- Approximately $3,000,009.900535 USDT associated with the cryptocurrency address ending in -MTqdk ("**Target Address 2**")

(collectively, the "Defendant Properties").

2.     On March 30, 2026, the government obtained seizure warrants in connection with a Federal Bureau of Investigation ("FBI") investigation into group of unknown subjects who engaged in a cryptocurrency investment fraud scheme and money laundering operation that targeted at least one Missouri victim. To seize the applicable USDT, Tether Limited will "burn" (i.e., destroy) the USDT tokens currency associated with the cryptocurrency wallet and reissue the equivalent amount of USDT tokens and transfer that equivalent amount to a government-controlled cryptocurrency wallet. In accordance with this process, Tether transferred the Defendant Properties to a U.S. government-controlled wallet on or about July 3, 2026.

3.     The Defendant Properties are presently in the custody of the Federal Bureau of Investigation (FBI), Kansas City, Field Office.

4.     As set forth in the subsequent paragraphs, the Defendant Properties constitute proceeds of Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h). Therefore, all funds that existed in wallets that contain the Defendant Properties on the date of seizure are subject to forfeiture.

2

5.     This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action under 18 U.S.C. § 981(a).

6.     This Court has *in rem* jurisdiction over the Defendant Properties pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district; and pursuant to 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395, because the Defendant Properties were brought into this district following seizure outside of the United States.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district; and pursuant to 28 U.S.C. § 1395, because the Defendant Properties were brought into this district following seizure outside of the United States.

**BASIS FOR FORFEITURE**

8.     The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C), because they constitute, are derived from, or are traceable to proceeds of wire fraud, a "specified unlawful activity," as that term is defined in 18 U.S.C. § 1956(c)(7). The Defendant Properties also are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).

3

## FACTUAL ALLEGATIONS

9. As described below, the Defendant Properties consists of proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343, and was involved in transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(1)(B)(i) (concealment money laundering) and/or 18 U.S.C. § 1956(h) (money laundering conspiracy) or property traceable to such property.

*The Online Scam*

### Victim 1

10. In March 2025, Victim 1, a resident of the Western District of Missouri, was looking for remote-only work opportunities through LinkedIn. Victim 1 found a listing for a remote work position with a company called "Synopsis" purportedly based in California. The company name was similarly worded to Synop_sys_, a California-based engineering firm that supplies tools and services to the semiconductor design and manufacturing industry. Victim 1 contacted LinkedIn user "Wen-Bo Fan" (FAN) about the position, who was listed on LinkedIn as Synopsis' senior vice president.

11. FAN responded initially by telling Victim 1 that the position was not remote and that Victim 1 would have to work in California. Victim 1 did not pursue the position due to its location in California.

12. Approximately four weeks later, FAN reached out again to Victim 1 through LinkedIn with a cryptocurrency investment opportunity. Victim 1 and FAN traded messages through LinkedIn until FAN suggested they move the conversation to WhatsApp. In those subsequent communications, FAN directed Victim 1 to invest

money in a purported online cryptocurrency investment platform accessible at "zhwlex.org." FAN instructed Victim 1 how to convert his/her savings to cryptocurrency using the exchange platform Coinbase. FAN also encouraged Victim 1 to borrow money from Victim 1's 401k.

13. After Victim 1 created an account with Zhwlex.org, Zhwlex.org's "customer service" told Victim 1 that he/she had been assigned an "investment sponsor" named Xin Chen since she was new to the website. The customer service chat message also provided Victim 1 with wiring instructions for "HGK Tax Service" as an alternative method for investing funds with Zhwlex.org.

14. Between June 2025 and August 2025, Victim 1, at the direction of FAN, sent approximately $672,000.00 via wire transfer to HGK Tax Service, Inc. and cryptocurrency transfers to addresses provided by FAN.

15. Following the transfers, Zhwlex.org appeared to show Victim 1's investments grow to approximately $1,200,000.00. In or around August 2025, FAN directed Victim 1 to withdraw Victim 1's funds. Victim 1 was informed by Zhwlex.org that Victim 1 needed to put more money in for the fees associated with the $1,200,000.00 withdrawal.

16. Victim 1 has not recovered any of his/her Zhwlex investments.

### *Victim 2*

17. In August 2025, Victim 2, an individual located in La Jolla, California, joined the online dating app "Coffee Meets Bagel" and met Brian Last Name Unknown, who represented himself as a 47-year-old man in San Diego who was

5

originally from Singapore. Brian claimed to work as a finance manager for Google. Brian helped Victim 2 register for accounts at Coinbase, Trustwallet, IMToken, and semexchange. Brian told Victim 2 that Victim 2 should invest in options trading. Victim 2 did invest funds but ultimately realized he/she had been scammed.

18. As further explained below, at least a portion of the funds invested by Victim 2 into the fraudulent options trading investment are traceable to the same wallets through which Victim 1 funds were transferred, including the Target Addresses.

*Cryptocurrency Tracing*

**Victim 1 tracing analysis**

19. Victim 1 and 2's funds were transferred in or through the following two wallet addresses on the TRON blockchain network:

**Target Address 1 – ending in -EJnsy**

**Target Address 2 – ending in -MTqdk**

20. A blockchain analysis of these addresses evidences numerous indicia of efforts to conceal the nature and source of the virtual currency moved in and out of the addresses, including a) rapid, large-scale, and irregular movement of tokens through intermediary wallets with no apparent business purpose, b) transactions involving newly created addresses, c) transactions between anonymous (i.e., unhosted or off-shore exchange) wallets, d) unusual transaction patterns (i.e., odd sizes and irregular timing), e) incoming transactions from large number of different address and outgoing transactions to smaller number of address (i.e., "funnel accounts), and

6

f) rapid, successive swapping of cryptocurrency across different blockchains, often using cross-chain bridges (i.e., "chain hopping").

21. Of the total approximately $672,000.00 lost by Victim 1 to the scam, approximately $175,000.00 is directly traceable to the Target Addresses. Specifically, or about August 19, 2025, Victim 1 transferred nearly $175,000.00 worth of USDC (minus transaction fees) from his/her Coinbase account to "UNSUB 1 wallet." The funds were moved to another unhosted wallet, "UNSUB 2" less than 30 minutes after the transaction by Victim 1.

22. Perpetrators of international cryptocurrency scams frequently use unhosted wallets (also known as self-hosted or non-custodial wallets) to launder stolen or illicit funds. Unlike hosted wallets managed by regulated exchanges, unhosted wallets allow users to maintain direct control over their private keys and transact peer-to-peer without an intermediary. This anonymity makes it easier for illicit actors to move funds without being linked to a real-world identity.

23. Less than 35 minutes later, Victim 1's funds moved from UNSUB 2 to yet another wallet, "UNSUB 3," where it was converted from USDC to a different stablecoin, DAI, a decentralized cryptocurrency pegged to the US dollar that is managed by MakerDAO. Unlike DAI, USDC and USDT are centrally controlled stablecoins.

24. One minute after converting to DAI, the Victim 1 funds moved to a fourth wallet, "UNSUB 4," where they were mixed with additional DAI of unknown origin. The following day, approximately 335,860 DAI—174,881.95 of which was

7

directly traceable to Victim 1—were transferred from UNSUB 4 to hosted wallet "UNSUB 5." After 45 minutes, 646,496 DAI moved from UNSUB 5 to unhosted wallet "UNSUB 6." Using the "Fraud-In/First-Out" tracing method, the transfer to UNSUB 6 was comprised of 174,881.95 DAI worth of Victim 1 funds, which is equivalent to approximately $174,881.

25. The Victim 1 funds in UNSUB 6 were next commingled with funds belonging to Victim 2, as further explained below. The combined funds were moved on September 2, 2025, to "UNSUB 7" through a transaction totaling 1,235,091 DAI. The Victim 1 and 2 funds were further mixed with other funds of unknown origin and moved in a 5,000,000 DAI transfer to UNSUB 8 on October 30, 2025. The aggregation of funds into the intermediary wallets and transfer outbound in increasingly larger transactions is consistent with the use of consolidation addresses to aggregate stolen funds from multiple victims into a single wallet, a technique used frequently by professional money laundering networks. The goal of this technique is to confuse the tracing analysis and break the chain of custody before sending funds to a centralized exchange (CEX) to be converted into fiat currency or otherwise off-ramped from the blockchain into the traditional financial system.

26. The 5,000,000 DAI is traceable (using the Fraud-In/First-Out tracing method) to "UNSUB 9" and "UNSUB 10" wallets through two nearly simultaneous transactions of 2,000,000 DAI. Over the next approximately 3 hours, the 4,000,000 DAI in the two wallets was converted to USDT through nine exchange transactions using Tokenlon, a decentralized exchange (DEX).

27. As the DAI was converted to USDT, it moved rapidly across dozens of transactions (likely using automated scripts and bots that enable movement of funds across potentially hundreds of wallets and multiple blockchains within minutes), a speed that can make it more difficult for law enforcement to trace and track in real-time. The tracing is indicative of the use of automated "peel chains," which is the technique of repeatedly "peeling off" small amounts of cryptocurrency from a larger sum into different wallets, creating a complex web of micro-transactions to obfuscate the source of the funds.

28. In addition to moving the funds between numerous wallets, the actors transferred all the USDT through HiFi Swap, a cross-chain exchange, to swap the USDT from the Ethereum network to the Tron network (a technique known as "chain-hopping"). The funds were ultimately reconsolidated into a single unhosted wallet "UNSUB 19" ending in -EJnsy, which is **Target Address 1**:

29. Notably, the funds were sent through HiFi Swap in the form of USDT and exited to UNSUB wallets 15–18 still in USDT form. Each transaction required paying "gas fees" to the exchange. There is no legitimate business purpose for paying to rapidly move funds between wallets and across blockchains.

30. Using the First-In/First-Out tracing method, approximately 174,285.2315 USDT of Victim 1's funds are directly traceable to UNSUB 15. Under the same tracing methodology, approximately 7,485.2526 USDT of Victim 2's funds (as further explained below) are directly traceable to UNSUB 15. At 12:16 GMT on November 16, 2025, a transfer of 300,000 USDT was made from UNSUB 15 to Non-

target wallet address ending in -QQrq3n. Using First-In/First-Out, Victim 1 and Victim 2's funds were encapsulated in the aforementioned transaction at 12:16 GMT.

31. The last of the consolidation transfers of USDT into **Target Address 1** occurred at 2:28 GMT on November 16, 2026. At 15:23 GMT, 2,000,000 USDT was moved from **Target Address 1** to **Target Address 2** ("UNSUB 20"), an unhosted wallet ending in -MTqdk.

32. Between November 7, 2025, and January 4, 2026, **Target Address 1** and **Target Address 2** conducted an additional 5 transactions: **Target Address 1** sent 3,041,200 USDT to **Target Address 2** across 4 transactions and **Target Address 2** sent **Target Address 1** 499,999 USDT in a single transaction.

33. Between the initial wallet activity on October 29, 2025, and the date of the freeze, **Target Address 1** had 146 incoming transactions ($9,656,193 USD) and 27 outgoing transactions ($9,585,177 USD). Between the initial wallet activity on November 2, 2025, and the date of the freeze, **Target Address 2** had 76 incoming transactions ($6,328,521 USD) and 9 outgoing transactions. ($3,330,047 USD). This transaction history is indicative of consolidation wallets used to aggregate stolen funds before disbursing them to additional theft-linked addresses.

34. The blockchain analysis of the UNSUB wallets is notable as well for the fact that UNSUBs 1 and 2 received "gas fees" only approximately one month prior to receiving the "investment" funds from Victim 1. There was no other activity in the wallets prior to the transactions involving Victim 1 funds. Likewise, UNSUBs 6–18 had no activity prior to the transactions described above.

35. Cryptocurrency wallets created shortly before receiving funds—often termed "disposable" or "nested" wallets—are a primary indicator of suspicious activity, including money laundering, scams, and theft. Using new and different addresses for transactions can make it more difficult for law enforcement to identify wallet ownership and trace wallet funds.

**Victim 2 tracing analysis**

36. On August 21, 2025, Victim 2 transferred approximately 41 Solana (SOL) token (equivalent to about $8,200) to wallet "UNSUB 21," where it was swapped to USDC using the Jupiter decentralized trading platform. A short time later, the USDC was sent across two transactions to Bitget, a cryptocurrency exchange based in the Cayman Islands, and transferred into "UNSUB 22" as USDT tokens. Mere minutes later, the USDT was divided and sent to two different wallets, "UNSUB 23" and "UNSUB 24" and swapped to DAI using Tokenlon.

37. Victim 2's funds in UNSUB 23 then were commingled with Victim 1's DAI funds in UNSUB 5. The combined victim funds moved from UNSUB 5 through to UNSUB 7, as previously discussed. Meanwhile, Victim 2's funds in UNSUB 24 moved rapidly through two more wallets before also being deposited into UNSUB 7. From there, the funds are moved to the Target Addresses, as previously described.

38. As of February 5, 2026, the date Tether froze the funds, approximately 69,306.396675 USDT was held in **Target Address 1** and approximately 3,000,009.900535 USDT was held in **Target Address 2**.

11

39.     Based on these facts, the entirety of the contents of the Target Addresses contained proceeds of fraud and/or were involved in or traceable to property involved in money laundering. As property involved in a violation of 18 U.S.C. § 1956 (laundering of monetary instruments), the contents of the Defendant Properties and are subject to civil forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A).

## CLAIMS FOR RELIEF

## **<u>FIRST CLAIM FOR RELIEF</u>**

40.     The Plaintiff repeats and incorporates by reference paragraphs 9 through 39 above.

41.     By the foregoing and other acts, the Defendant Properties, constitute, or were derived from, proceeds traceable to wire fraud (18 U.S.C. § 1343), and therefore, are forfeitable to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C).

## **<u>SECOND CLAIM FOR RELIEF</u>**

42.     The Plaintiff repeats and incorporates by reference paragraphs 9 through 39 above.

43.     By the foregoing and other acts, the Defendant Properties constitute property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(h), or are traceable to such property, and therefore, are forfeitable to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE the United States prays that the Defendant Properties be forfeited to the United States and disposed of according to law, that the plaintiff be

awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just.

Respectfully submitted,

**R. MATTHEW PRICE**
United States Attorney

By:     */s/ John Constance*
John Constance
Assistant United States Attorney
400 E. 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122
E-mail: John.Constance@usdoj.gov

13

# VERIFICATION

I, Special Agent Jeffrey Fraley, hereby verify and declare under penalty of perjury that I am a Special Agent with the United States Federal Bureau of Investigation, that I have read the foregoing Verified Complaint in Rem and know the contents thereof, and that the factual matters contained in paragraphs 9 through 39 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: 7/20/2026

_____
Jeffrey Fraley
Special Agent
Federal Bureau of Investigation